SLR:BDM:KKO
F. #2015V00964

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – X

UNITED STATES OF AMERICA,                    VERIFIED COMPLAINT IN REM

                Plaintiff,                    Civil Docket No. _____

        – against –

APPROXIMATELY FOUR HUNDRED
FIFTY (450) ANCIENT CUNEIFORM
TABLETS; and

APPROXIMATELY THREE
THOUSAND (3,000) ANCIENT CLAY
BULLAE,

           Defendants *in Rem*.

– – – – – – – – – – – – – X

       Plaintiff, United States of America, by its attorney, BRIDGET M. ROHDE,

Acting United States Attorney for the Eastern District of New York, Karin Orenstein,

Assistant United States Attorney, of counsel, for its verified complaint *in rem*, hereby alleges

upon information and belief as follows:

## PRELIMINARY STATEMENT

      1.    Plaintiff brings this action *in rem* to condemn and forfeit to the use and

benefit of the United States the above-captioned property pursuant to 19 U.S.C.

§ 1595a(c)(1)(A), as merchandise that was introduced or attempted to be introduced into the

United States contrary to law.

## DEFENDANTS *IN REM*

2.     The Defendants *in Rem* are ancient clay and stone artifacts that
originate in the area of modern day Iraq.   Photographs of samples of the Defendants *in Rem*
are attached as Exhibit A.

a.     Approximately 450 Cuneiform Tablets.   Cuneiform is an
ancient system of writing on clay tablets that was used in ancient Mesopotamia thousands of
years ago.   The names of people, places and months used on several of the Defendant *in
Rem* cuneiform tablets confirm that these tablets originated in the area that is now Iraq.
These clay tablets are generally not baked or fired and must be handled carefully to avoid
damage.

b.     Approximately 3,000 Clay Bullae.   Clay bullae are balls of clay
on which seals have been imprinted.

3.     From January 3, 2011 through January 5, 2011, five Federal Express
("FedEx") shipments from the United Arab Emirates ("UAE") to a purchaser in Oklahoma
City, Oklahoma were detained on arrival in Memphis, Tennessee by officers of the
Department of Homeland Security, U.S. Customs and Border Protection ("CBP" or
"Customs").   On or about January 19, 2011, the five shipments were seized by CBP officers.
The shipments contained a combined total of approximately 223 cuneiform tablets and
approximately 300 clay bullae (collectively, the "Seized Defendants *in Rem*").   On or about
February 8, 2011, the Seized Defendants *in Rem* were transferred to a climate-controlled
storage facility in Queens, New York.   The remaining Defendants *in Rem*, approximately
227 cuneiform tablets and approximately 2,700 clay bullae (collectively, the "Additional
Defendants *in Rem*") were shipped by express post from the UAE and Israel to the same

purchaser.   Upon arrival in the United States, these shipments were processed at the international mail facility at John F. Kennedy International Airport ("JFK") in Queens, New York.   They were then delivered to the purchaser and are presently located in Oklahoma City, Oklahoma.

## JURISDICTION AND VENUE

4.     This court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

5.     Venue in the Eastern District of New York is proper as to the Seized Defendants *in Rem*, pursuant to Title 28, United States Code, Sections 1355(b)(1)(B) and 1395(b), in that the Seized Defendants *in Rem* are presently located in Queens, New York, which lies within the Eastern District of New York.

6.     Venue in the Eastern District of New York is proper as to the Additional Defendants *in Rem* pursuant to Title 28, United States Code, Sections 1355(b)(1)(A), 1355(b)(1)(B) and 1395(a), in that events giving rise to the forfeiture of the Additional Defendants *in Rem* occurred within the Eastern District of New York.

## APPLICABLE FORFEITURE LAW

7.     Title 19, United States Code, Section 1595a(c)(1)(A) provides that "[m]erchandise which is introduced or attempted to be introduced into the United States contrary to law . . . shall be seized and forfeited if it . . . is stolen, smuggled, or clandestinely imported or introduced."   Id.

8.     Merchandise is deemed "smuggled, or clandestinely imported or introduced" if it was imported contrary to Title 18, United States Code, Sections 542 or 545, among other laws.

9.      Section 542 provides in pertinent part:

Whoever enters or introduces, or attempts to enter or introduce, into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, declaration, affidavit, letter, paper or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance, or makes any false statement in any declaration without reasonable cause to believe the truth of such statement, or procures the making of any such false statement as to any matter material thereto without reasonable cause to believe the truth of such statement, whether or not the United States shall or may be deprived of any lawful duties . . . .

violates the law.

10.     Section 545 provides in pertinent part:

Whoever knowingly and willfully, with intent to defraud the United States, smuggles, or clandestinely introduces or attempts to smuggle or clandestinely introduce into the United States any merchandise which should have been invoiced, or makes out or passes, or attempts to pass, through the customhouse any false, forged, or fraudulent invoice, or other document or paper; or

Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law . . . .

violates the law.

## THE CUSTOMS IMPORTATION PROCESS

11.     Shipments of goods arriving at the ports of the United States must be granted "entry," or clearance, by Customs, prior to the goods being allowed to enter the commerce of the United States.   The importer of a shipment may obtain such clearance through the use of a "customs broker."   Private express mail and freight shippers, including FedEx, offer customs brokerage services to customers to make entry for their goods to be allowed to enter the United States.

12.     In 2010 and 2011, Title 19, Code of Federal Regulations, Section 143.21(a) provided that goods valued at $2,000 or less could be entered via Customs' informal entry process.   At that time, goods valued at greater than $2,000 were subject to the Customs formal entry process.   CBP Form 7501, which is filed by the importer as part of the formal entry process, requires truthful declaration of the goods' country of origin, description and value, among other information.

13.     Title 19, Code of Federal Regulations, Section 145.11 provides that shipments arriving by international mail must include a Customs declaration on the form provided by the foreign post office, giving a full and accurate description of the contents and value of the merchandise.   In addition, the shipment must contain an invoice or bill of sale, giving an accurate description and the purchase price of the merchandise.   Merchandise shipped through the international postal service is forwarded upon its arrival in the United States to one of CBP International Mail Branches for clearance.

14.     Based on the information provided on entry paperwork, Customs may clear a particular shipment without inspecting it.   Indeed, the large volume of cargo arriving at the ports each day prohibits Customs from examining every container or shipment prior to Customs' release.   Customs will review information provided via the formal and informal entry process and target certain shipments for review and may randomly select shipments for inspection.   If and when Customs clears a shipment based on a formal or informal entry, the shipment may be removed from the port and delivered to the importer or consignee.

15.     Importation of cultural property into the United States in violation of a foreign country's patrimony law violates the National Stolen Property Act, codified at Title 18, United States Code, Section 2314, et seq.   When Customs intercepts cultural property

that is protected under the cultural patrimony law of its country of origin, and the importer is unable to supply a valid provenance showing the property's history of ownership pre-dating the applicable cultural patrimony law, the property may be detained and seized.   The seized cultural property may then be the subject of administrative or judicial forfeiture proceedings.

16.    Persons who import cultural property into the United States believing that the property is or may be stolen, or who may wish to avoid detention and scrutiny of the property for other reasons, generally seek to avoid detection and targeting by Customs. Such importers often seek to avoid detection and targeting by Customs by means of false statements regarding the description, value and country of origin of the goods in their shipments.   To avoid scrutiny of packages based on information provided in formal entry paperwork, such importers may split shipments so that the packages' individual values remain below the threshold for formal entry or falsely state that each shipment's value is below that threshold.   To avoid scrutiny of packages based on the identity of the importer, such importers may ship packages to or through other addresses.

**LEGAL PROTECTIONS FOR IRAQI CULTURAL PROPERTY**

17.    <u>U.S. Law</u>.   The importation of Iraqi cultural property into the United States has been restricted since 1990.   In 1990, the United States implemented a general ban on importation of any Iraqi goods via the Iraqi Sanctions Regulations, codified at Title 31, Code of Federal Regulations, Part 575.   In 2004, Title 31, Code of Federal Regulations, Section 575.533 was amended to lift the general ban while retaining more limited restrictions, including a ban on the importation of "Iraqi cultural property or other items of archeological, historical, cultural, rare scientific, and religious importance illegally removed from the Iraq National Museum, the National Library, and other locations in Iraq since

August 6, 1990."   Per Section 575.533(b)(5), "[a]ny trade in or transfer of such items, including items with respect to which reasonable suspicion exists that they have been illegally removed, remains prohibited . . . ."   In 2010, the Iraqi Sanctions Regulations were repealed and replaced with the Iraq Stabilization and Insurgency Sanctions Regulations, codified at Title 31, Code of Federal Regulations, Part 576.   In particular, Section 576.208 prohibits "the trade in or transfer of ownership or possession of Iraqi cultural property or other items of archeological, historical, cultural, rare scientific, and religious importance that were illegally removed, or for which a reasonable suspicion exists that they were illegally removed, from the Iraq National Museum, the National Library, and other locations in Iraq since August 6, 1990."   The regulation incorporates the criminal and civil penalties set forth in the International Emergency Economic Powers Act (codified at Title 50, United States Code, Section 1705).

        18.   <u>Iraqi Law</u>.   Under Article 3 of Iraq's Antiquities Law No. 59 of 1936 (as amended in 1974 and 1975), all antiquities found in Iraq, whether movable or immovable, on or under the ground, are considered property of the state.   Under Article 16 of Antiquities Law No. 59, private persons generally cannot possess antiquities.   Where private possession is authorized, the antiquities must be registered with the government and may only be transferred to another Iraqi with government approval.   Article 26 of Antiquities Law No. 59 prohibits the export of Iraqi antiquities.   The law's definition of "antiquities" includes movable possessions which were made, produced, sculpted, written or drawn by man and which are at least 200 years old.   In 2002, Iraq issued Antiquities and Heritage Law, Law No. 55 of 2002, which contains similar provisions.

## FACTUAL BACKGROUND

19.     In or about 2009, Hobby Lobby Stores, Inc. ("Hobby Lobby" or "HL"),

a privately-held corporation headquartered in Oklahoma City, Oklahoma, began to assemble

a collection of historically important manuscripts, antiquities and other cultural materials (the

"Collection").   Hobby Lobby's president (the "President") approved purchases for the

Collection and was advised by a consultant (the "Consultant") who was retained by Hobby

Lobby at that time.

20.     On or about July 15, 2010, the President and the Consultant inspected a

large number of cuneiform tablets and other artifacts being offered for sale in the United

Arab Emirates ("UAE")   (the "July 2010 Inspection").   Several antiquities dealers from

Israel (hereinafter, "Israeli Dealer #1" and "Israeli Dealer #2") as well as an antiquities

dealer from the UAE (the "UAE Dealer") attended the July 2010 Inspection.   The

contemplated sale included 5,548 distinct artifacts:   1,500 cuneiform tablets, 500 cuneiform

bricks, 3,000 clay bullae, 35 clay envelope seals, 13 extra-large cuneiform tablets and 500

stone cylinder seals.   During the July 2010 Inspection, the artifacts were displayed

informally – spread on the floor, arranged in layers on a coffee table, and packed loosely in

cardboard boxes, in many instances with little or no protective material between them.

Following the inspection, the Israeli dealers proposed a sale of a larger group of cultural

objects that included approximately 5,548 individual pieces of cuneiform tablets, clay bullae,

and cylinder seals (each an "Artifact" and together the "Artifacts").

21.     On or about July 18, 2010, upon returning to the United States from the

UAE, the President orally advised a CBP officer that he was transporting a bible for which

he had paid over $1 million.   The President had failed to file formal entry paperwork for the

bible and had not declared it on his traveler Customs declaration form (CBP Form 6059b).

He was referred to secondary inspection where he explained that he had not believed that a

declaration was required because he had paid for the bible prior to his trip.   After

questioning the President, CBP officers advised him that while there is no duty on imported

religious items or books, high value items must be declared to Customs.   The President was

permitted to attach a handwritten invoice to the Customs declaration form and retain the

bible.

22.     On or about July 27, 2010, Hobby Lobby's in-house counsel ("In-house

Counsel") contacted an expert in cultural property law (the "Expert") to request that the

Expert make a presentation to Hobby Lobby.   The Expert offered to address the legal issues

relevant to the acquisition of historical works and antiquities, actions to take in carrying out

due diligence and provenance research, and the particular legal issues pertaining to cultural

property.

23.     On or about August 9, 2010, the Expert made a presentation to a group

that included the President, the Consultant and In-house Counsel at Hobby Lobby's

headquarters in Oklahoma City, Oklahoma.   The presentation covered the legal

requirements for importing cultural property, among other topics.   During this visit, the

Expert learned that Hobby Lobby was interested in purchasing cuneiform materials.

24.     On or about August 23, 2010, the Consultant reported to the President

and the President's executive assistant (the "Executive Assistant") that he had met with

Israeli Dealers #1 and #2 in Israel, and they told him that the Artifacts inspected in the UAE

belonged to the family collection of another dealer ("Israeli Dealer #3").   Israeli Dealer #3

was not present for the July 2010 Inspection.   The Consultant further reported that, per

Israeli Dealers #1 and #2, the Artifacts had been in Washington, D.C. and were shipped to the UAE for the July 2010 Inspection.   The Consultant advised Hobby Lobby that the offering price for the Artifacts was $2,091,000.00 and that while he believed they could be appraised at $11,820,000, he believed Hobby Lobby could negotiate to purchase them for $1,600,000.00.

   25. On or about August 30, 2010, Israeli Dealer #1 sent Hobby Lobby a provenance statement from Israeli Dealer #3 for approximately 5,513 of the Artifacts (35 clay envelope seals were not included) (the "5,513 Artifacts").   The provenance statement indicated that the 5,513 Artifacts were "legally acquired in the late 1960s by [Israeli Dealer #3's] father, from local markets."   The provenance statement further indicated that the collection had been moved to the United States for storage in the 1970s, named the person storing the 5,513 Artifacts (the "Alleged Custodian"), and listed the Alleged Custodian's address in Mississippi and telephone numbers.   At no time did Hobby Lobby or any of its agents contact the Alleged Custodian to confirm the Alleged Custodian's involvement with the 5,513 Artifacts.   In fact, the Alleged Custodian first met Israeli Dealer #3 during a 2007 trip to Israel and did not store any material for Israeli Dealer #3.

   26. On or about October 19, 2010, at the request of the In-house Counsel, the Expert provided Hobby Lobby with a memorandum summarizing the Expert's advice. A section of the memorandum was devoted to Iraqi cultural property and included the following statement:

> I would regard the acquisition of any artifact likely from Iraq
> (which could be described as Mesopotamian, Assyrian,
> Akkadian, Sumerian, Babylonian, Parthian, Sassanian and
> possibly other historic or cultural terms) as carrying
> considerable risk.   An estimated 200-500,000 objects have been

> looted from archaeological sites in Iraq since the early 1990s;
> particularly popular on the market and likely to have been
> looted are cylinder seals, cuneiform tablets . . . .   Any object
> brought into the US and with Iraq declared as country of origin
> has a high chance of being detained by US Customs.   If such an
> object has been brought into the US in the past few years and
> was not stopped by US Customs, then you need to examine the
> import documents to see if the country of origin was properly
> declared; an improper declaration of country of origin can also
> lead to seizure and forfeiture of the object.

The Expert's memorandum further advised Hobby Lobby that cultural property looted from

Iraq since 1990 is specifically protected by import restrictions that carry criminal penalties

and fines.   The Expert's memorandum was received by In-house Counsel but was not shared

with Hobby Lobby's President, Consultant, Executive Assistant, International Department,

outside customs brokers, or anyone involved in the purchase and importation of the

Defendants *in Rem*.

27.    On or about December 8, 2010, Israeli Dealer #2 and Hobby Lobby,

through its President, signed a purchase agreement for the sale of the Artifacts to Hobby

Lobby for $1,600,000 U.S. Dollars (the "Order").   According to the invoice attached to the

purchase agreement for the Order (the "Invoice"), the seller was Israeli Dealer #3.   No

Hobby Lobby representatives or agents had ever met or communicated with Israeli Dealer

#3.   The Invoice falsely stated that the Artifacts in the Invoice originated in Israel.   The

individual prices for artifacts on the invoice ranged from $280.40 to $1,000.00 per item.

Thus, any shipment comprised of more than seven invoiced artifacts would have exceeded

$2,000.00 in value and required formal entry.

28.    On or about December 8, 2010, the President authorized payment of

$1,600,000 million U.S. Dollars for the Order to be wired to seven personal bank accounts

associated with five different individuals.   Israeli Dealer #1 provided the payee account information to Hobby Lobby.   The payees included Israeli Dealers #1 and #2, the UAE Dealer and two other individuals, but did not include Israeli Dealer #3, who was represented in the Invoice to be the seller of the Artifacts.

29.     On or about December 10, 2010, Israeli Dealer #1 asked Hobby Lobby to revise the purchase agreement to replace Israeli Dealer #2 with Israeli Dealer #3 as the seller "because the invoice is from [Israeli Dealer #3's] family and the collection is the [Israeli Dealer #3] family collection."

30.     On or about December 15, 2010, the President and Israeli Dealer #3 executed a revised purchase agreement for the Order.

31.     In 2010 and 2011, Hobby Lobby had an International Department that was tasked with facilitating the importation and customs clearance of merchandise purchased by Hobby Lobby.   The International Department routinely worked with a particular customs broker (the "Customs Broker") to import items purchased by Hobby Lobby from foreign vendors.

32.     Commencing on or about November 9, 2010, a Hobby Lobby employee tasked with receiving and cataloguing artifacts purchased for the Collection (the "Curator") began working with Hobby Lobby's International Department and the Executive Assistant to coordinate the importation of the Artifacts.   The International Department advised the Curator and Executive Assistant that the Artifacts should be imported using the Customs Broker.   However, after the Customs Broker reported that the Artifacts could be detained by CBP, the Curator and Executive Assistant decided to bypass the International

Department and Customs Broker and have Israeli Dealers #1 and #2 handle the shipping
arrangements for the Order.

The Additional Defendants *in Rem*

33.     On or about November 23, 2010, prior to the execution of the purchase
agreement for the Order, the UAE Dealer shipped the first package of Artifacts to Hobby
Lobby by international post.   The shipping label on the exterior of the package was
misleading because it described the contents as "ceramic tiles."   The shipment contained
either 13 or 23 pieces of the Defendants *in Rem*.   No formal entry was made for this
shipment, even though a formal entry was required because the value of the contents of the
package exceeded $2,000.   The package was received by Hobby Lobby.

34.     On or about December 19, 2010, the UAE Dealer shipped three more
packages by international post, each containing between 13 and 18 pieces of the Defendants
*in Rem*.   The shipping labels falsely described the packages' contents as "Tiles (Sample)."
The shipping labels did not list a country of origin or value for the contents.   Each shipment
was addressed to the President and/or the Executive Assistant.   The remaining addressee
information on the shipments, however, alternated between the addresses of three different
business entities:   Hobby Lobby, Mardel, Inc. and Crafts, Etc!   In or around 2010 through
2011, Mardel, Inc. and Crafts, Etc! were affiliates of Hobby Lobby and both maintained their
principal corporate offices adjacent to Hobby Lobby's headquarters in Oklahoma City,
Oklahoma.   The President had authorized the use of these three addresses at the request of
the UAE Dealer.   The use of multiple shipping addresses for a single recipient is consistent
with methods used by cultural property smugglers to avoid scrutiny by Customs.   No formal
entries were made for these shipments, even though formal entries were required because the

value of the contents of each package exceeded $2,000.   All three packages were received by Hobby Lobby.

35.     On December 20, 2010, the UAE Dealer shipped three more packages by international post to the President and/or Executive Assistant using the addresses for Hobby Lobby, Mardel, and Crafts, Etc!   Each of these packages contained between 12 and 18 pieces of the Defendants *in Rem*.   The shipping labels again falsely described the packages' contents as "Tiles (Sample)."   The shipping labels did not list a country of origin or value for the contents.   No formal entries were made for these shipments, even though formal entries were required because the value of the contents of each package exceeded $2,000.   All three packages were received by Hobby Lobby.

36.     On or about September 1, 2011, Hobby Lobby received a package of 1,000 clay bullae shipped from Israel by Dealer #1 using international express post.   The shipping label accurately described its contents as "1000 Clay bullae tablets" but falsely declared their country of origin as "Israel."   The package included an Israeli export license which declared the provenance of the clay bullae to be the family collection of Israeli Dealer #1.   This declaration was inconsistent with the provenance provided by Israeli Dealer #3. This package was received by Hobby Lobby.

37.     The shipments containing the Additional Defendants *in Rem* were sent by international post and were processed at the international mail facility at JFK in Queens, New York.

The Seized Defendants *in Rem*

38.    On or about December 22, 2010, the UAE Dealer advised the Executive Assistant that the international post rules had changed and inquired as to whether the remaining packages could be shipped by FedEx or another private express mail carrier.

39.    On or about December 23, 2010, the Executive Assistant advised the UAE Dealer by email, in sum and substance and in part, that "[a]s long as you keep the value of each package under $2,000, they will not have to forward it to our broker to clear it through Customs."

40.    On or about and between December 26, 2010 and January 5, 2011, the UAE Dealer shipped approximately eight packages to Hobby Lobby via FedEx.   Each package contained between 12 and 300 pieces of the Artifacts, and the value of the contents of each package therefore exceeded $2,000.00.   The UAE Dealer supplied false invoices and false shipping declarations that substantially undervalued the pieces being shipped and stated that each package was worth between $250.00 and $300.00.

41.    The foregoing FedEx shipments shipped between December 26, 2010 and January 5, 2011 were processed by FedEx in Memphis, Tennessee.   The first three FedEx packages were delivered to Hobby Lobby.   As discussed below, the next five shipments were inspected and detained by Customs in Memphis, Tennessee:

a.    First Detained Package.   On or about January 3, 2011, Customs inspected a FedEx package bearing air waybill no. 7286 2809 6729 from the UAE Dealer to the "[President] or [Executive Assistant]" at Mardel's address.   The shipping label falsely stated that the contents were "hand made [sic] clay tiles (sample)" manufactured in Turkey and valued at $250.00.   The invoice accompanying this shipment similarly declared falsely

that the contents were 50 "hand made [sic] miniature clay tiles" valued at $5.00 each for a total value of $250.00.   In addition, this invoice falsely indicated that the contents were sold by the UAE Dealer to Mardel.   The package contained approximately 50 cuneiform tablets. According to the Invoice attached to the purchase agreement for the Order, the price of each cuneiform tablet was $280.40.   The total value of this package therefore should have been declared as $14,020.00 and formal entry should have been made with truthful declarations as to descriptions of the items, country of origin, the name of the seller, and the name of the buyer.

b.   Second Detained Package.   On or about January 4, 2011, Customs inspected a FedEx package bearing air waybill no. 7286 2809 6751 from the UAE Dealer to the "[President] or [Executive Assistant]" at Hobby Lobby's address.   The shipping label falsely stated that the contents were "hand made [sic] clay tiles" manufactured in Turkey and valued at $300.00.   The invoice accompanying this shipment similarly declared falsely that the contents were 300 "hand made [sic] clay tiles (round shap[e]) (sample)" valued at $1.00 each for a total value of $300.00.   In addition, this invoice falsely indicated that the contents were sold by the UAE Dealer to Hobby Lobby.   The package contained approximately 300 clay bullae.   According to the Invoice attached to the purchase agreement for the Order, the value of each clay bullae was $280.40.   The total value of this package therefore should have been declared as $84,120.00 and formal entry should have been made with truthful declarations as to descriptions of the items, country of origin and the name of the seller.

c.   Third Detained Package.   On or about January 4, 2011, Customs inspected a FedEx package bearing air waybill no. 7286 2809 6762 from the UAE

Dealer to the [President] or [Executive Assistant]" at Crafts, Etc!'s address.   The shipping label falsely stated that the contents were "hand made [sic] clay tiles" manufactured in Turkey and valued at $285.00.   The invoice accompanying this shipment similarly declared falsely that the contents were 57 "hand made [sic] miniature clay tiles (sample)" valued at $5.00 each for a total value of $285.00.   In addition, this invoice falsely indicated that the contents were sold by the UAE Dealer to Crafts, Etc!   The package contained approximately 54 cuneiform tablets.   According to the Invoice attached to the purchase agreement for the Order, the value of each cuneiform tablets was $280.40.   The total value of this package therefore should have been declared as at least $15,141.60 and formal entry should have been made with truthful declarations as to descriptions of the items, country of origin, the name of the seller, and the name of the buyer.

      d.   <u>Fourth Detained Package</u>.   On or about January 5, 2011, Customs inspected a FedEx package bearing air waybill no. 7286 2809 7173 from the UAE Dealer to the "[President] or [Executive Assistant]" at Mardel's address.   The shipping label falsely stated that the contents were "hand made [sic] clay tiles" manufactured in Turkey and valued at $300.00.   The invoice accompanying this shipment similarly declared falsely that the contents were 60 "hand made [sic] miniature clay tiles (sample)" valued at $5.00 each for a total value of $300.00.   In addition, this invoice falsely indicated that the contents were sold by the UAE Dealer to Mardel.   The package contained approximately 60 cuneiform tablets.   According to the Invoice attached to the purchase agreement for the Order, the value of each cuneiform tablet was $280.40.   The total value of this package therefore should have been declared as $16,824.00 and formal entry should have been made with

truthful declarations as to descriptions of the items, country of origin, the name of the seller, and the name of the buyer.

e. <u>Fifth Detained Package</u>.   On or about January 5, 2011, Customs inspected a FedEx package bearing air waybill no. 7286 2809 7162 from the UAE Dealer to the "[President] or [Executive Assistant]" at Crafts, Etc!'s address.   The shipping label falsely stated that the contents were "hand made [sic] clay tiles" manufactured in Turkey and valued at $300.00.   The invoice accompanying this shipment similarly declared falsely that the contents were 60 "hand made [sic] miniature clay tiles (sample)" valued at $5.00 each for a total value of $300.00.   In addition, this invoice falsely indicated that the contents were sold by the UAE Dealer to Crafts, Etc!   The package contained approximately 59 cuneiform tablets.   According to the Invoice attached to the purchase agreement for the Order, the value of each cuneiform tablet was $280.40.   The total value of this package therefore should have been declared as at least $16,543.60 and formal entry should have been made with truthful declarations as to descriptions of the items, country of origin, the name of the seller, and the name of the buyer.

42.    On or about January 19, 2011, CBP seized the five detained FedEx packages, which collectively contained approximately 223 cuneiform tablets and 300 clay bullae, comprising the Seized Defendants *in Rem*.

<u>Administrative Proceedings</u>

43.    On or about March 17, 2011, CBP sent notices of the seizure of the Seized Defendants *in Rem* to the President and Executive Assistant.

44.    On or about May 16, 2011, Hobby Lobby filed an administrative petition with CBP seeking return of the Seized Defendants *in Rem* (the "Petition").   In

support of the Petition, Hobby Lobby attached the August 30, 2010 provenance statement from Israeli Dealer #3 for the 5,513 Artifacts.   Hobby Lobby also attached a May 1, 2011 provenance statement from the UAE Dealer claiming ownership of "227 clay tiles/tablets and 300 miniature ceramic tiles," that is, the amount and type of Artifacts reflected on the shipping labels of the Seized Defendants *in Rem* only, which Artifacts were already accounted for in Israeli Dealer #3's provenance.   The Petition did not explain why there were two provenance statements presented for the same Artifacts; instead, the Petition stated that HL "intended to purchase lots of artifacts from [Israeli Dealer #1, the UAE Dealer and Israeli Dealer #3] through one common purchase order . . . invoiced by [Israeli Dealer #3]."

45.     On or about September 7, 2011, Hobby Lobby submitted a supplemental petition to CBP (the "Supplemental Petition").   The Supplemental Petition stated that the reason that payments for the Order were made through "separate wire transfers was that various *original owners* were to be paid directly."   (Emphasis added.)   This explanation was inconsistent with the fact that Israeli Dealer #3's provenance statement covered almost the entire Order and Israeli Dealer #3 was not one of the payees.   It was also inconsistent with representations made to Hobby Lobby about listing Israeli Dealer #3 in the purchase agreement "because the invoice is from [Israeli Dealer #3's] family and the collection is the [Israeli Dealer #3] family collection."

46.     On or about July 8, 2015, CBP sent amended notices of the seizure of the Seized Defendants *in Rem* to counsel for Hobby Lobby providing additional legal authority for the seizure.

Judicial Proceedings

47.     On or about September 3, 2015, counsel for Hobby Lobby responded to the notices of seizure by requesting referral of the Seized Defendants *in Rem* to the U.S. Attorney's Office for commencement of judicial forfeiture proceedings.

48.     Hobby Lobby subsequently executed a series of tolling agreements with the United States to exclude time from the statute of limitations period with respect to the Defendants *in Rem*.   Pursuant to the tolling agreements, the statute of limitations was tolled from September 30, 2015 through June 2, 2017.

## CLAIM FOR RELIEF

49.     Plaintiff repeats the allegations of paragraphs 1 through 48 as if fully set forth herein.

50.     The Seized Defendants *in Rem* constitute property that was smuggled or clandestinely imported or introduced, or attempted to be introduced, into the United States contrary to Title 18, United States Code, Sections 542 and/or 545, because the shipper knowingly made false declarations as to its value, description and country of origin.

51.     The Additional Defendants *in Rem* constitute property that was smuggled or clandestinely imported or introduced into the United States contrary to Title 18, United States Code, Sections 542 and/or 545, because the shipper knowingly made false declarations as to its value and description and, in failing to file formal entry declarations, omitted the required declaration as to country of origin.

52.     As a result of the foregoing, the Defendants *in Rem* are liable to condemnation and to forfeiture to the United States, in accordance with Title 19, United States Code, Section 1595a(c)(1)(A).

WHEREFORE, plaintiff, United States of America, requests that a warrant of this Court be issued for the arrest of the Defendants *in Rem*; that due notice of these proceedings be given to all interested persons; that the Defendants *in Rem* be forfeited and condemned to the use of the United States of America; that the plaintiff be awarded its costs and disbursements in this action; and for such other relief and further relief as this Court deems just and proper.

Dated:   Brooklyn, New York
         July 5, 2017

                                  BRIDGET M. ROHDE
                                  Acting United States Attorney
                                  Eastern District of New York
                                  271 Cadman Plaza East
                                  Brooklyn, New York 11201


                           By:    _____
                                  Karin Orenstein
                                  Assistant U.S. Attorney
                                  (718) 254-6188

## VERIFICATION

JOHN PAUL LABBAT, hereby declares as follows:

1.      I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations.

2.      I have read the within Verified Complaint *in Rem* and know the contents thereof.

3.      I believe the matters contained in the within Verified Complaint *in Rem* are true and accurate to the best of my knowledge, information and belief.

4.      The source of my information and the grounds for my belief are personal knowledge and information provided by other law enforcement officers and the official files and records of the United States of America.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:      Brooklyn, New York
            June 21, 2017

John Paul Labbat
Special Agent
U.S. Department of Homeland Security,
Homeland Security Investigations

**Exhibit A**
**Sample Images of the Defendants *in Rem***



Cuneiform Tablet





Cuneiform Tablets



Clay Bullae