AL:BDM:KKO/ABK
F. #2015V00964

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA,

                  Plaintiff,

       – against –

APPROXIMATELY FOUR HUNDRED
FIFTY (450) ANCIENT CUNEIFORM
TABLETS; and

APPROXIMATELY THREE
THOUSAND (3,000) ANCIENT CLAY
BULLAE,

           Defendants *in rem*.

– – – – – – – – – – – – – – – – – –X

STIPULATION OF SETTLEMENT

Civil Docket No. _____

        Hobby Lobby Stores, Inc. ("Hobby Lobby" or the "Company"), an Oklahoma corporation acting pursuant to authority granted by the Company's Board of Directors in the form of a board resolution (as certified by its General Counsel in the Certificate attached hereto as Attachment A), and the United States Attorney's Office for the Eastern District of New York (the "Office") (each a "Party" and collectively, the "Parties") hereby enter into this Stipulation of Settlement and Decree of Forfeiture (the "Stipulation") and agree as follows:

1.      By executing this Stipulation, the Parties stipulate and agree to the Statement of Facts, which is attached as Attachment B and incorporated herein by reference (the "Statement of Facts").

2.      The Parties wish to settle and resolve this matter upon the terms and conditions set forth herein.

## THE FORFEITURE OF THE DEFENDANTS *IN REM*

3.      Hobby Lobby acknowledges that the Office is contemporaneously filing, in the United States District Court for the Eastern District of New York, a Verified Complaint *in Rem* seeking the forfeiture of the above-named Defendants *in rem* (the "Complaint"), together with a proposed Warrant for Arrest of Articles *in rem* (the "Warrant").

4.      Hobby Lobby, having reviewed a copy of the Complaint, hereby waives service of the Complaint and the Warrant and any and all notice requirements, including notice pursuant to Supplemental Rule G of the Federal Rules of Civil Procedure ("Rule G").

5.      The Complaint alleges that the Defendants *in rem* constitute property or merchandise that was introduced or attempted to be introduced into the United States contrary to law, and are therefore subject to forfeiture pursuant to Title 19, United States Code, Section 1595a(c)(1)(A).

6.      This Stipulation shall be deemed a timely filed claim by Hobby Lobby to the Defendants *in rem*.

7.     Hobby Lobby represents that it possesses an exclusive ownership interest in the Defendants *in rem*. Hobby Lobby further represents and warrants that, as the sole owner of the Defendants *in rem*, it has all legal right to transfer its exclusive right, title and interest the Defendants *in rem* without the intervention, consent or approval of a third party.

8.     Hobby Lobby agrees not to file an answer or other response to the Complaint, or to make further claim of right, title or interest to the Defendants *in rem* in the above-captioned proceeding or any judicial or administrative forfeiture proceedings related to the Defendants *in rem*.

9.     Hobby Lobby agrees to assist the United States in effectuating the forfeiture of the Defendants *in rem* by delivery of any Defendants *in rem* that are within the custody and control of Hobby Lobby to a place to be designated by the United States.

10.    Hobby Lobby shall deliver the Defendants *in rem* using a packing and shipping method mutually agreed upon by the Parties, at Hobby Lobby's sole expense, no later than June 30, 2017, unless the Parties agree in writing to a later date.

## THE FORFEITURE OF ADDITIONAL ASSETS

11.    Hobby Lobby acknowledges that certain money and property, namely (a) the sum of three million dollars and zero cents ($3,000,000.00), and (b) 144 cylinder seals that were imported into the United States without formal entry are subject to civil forfeiture to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) as proceeds of one or more violations of Title 18, United States Code, Section 542, and/or pursuant to Title 19, United States Code, Section 1595a(c)(1)(A) as a substitute *res* for

dissipated property or merchandise that was introduced or attempted to be introduced into the United States contrary to law in 2009 through 2011. Hobby Lobby consents to the seizure and forfeiture of (a) the sum of three million dollars and zero cents ($3,000,000.00), and (b) 144 cylinder seals to the United States of America (the "Forfeited Assets") pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(a) and Title 19, United States Code, Section 1595a(c)(1)(A).

    12. Hobby Lobby hereby waives any and all rights to the Defendants *in rem* and the Forfeited Assets, and agrees not to file a claim or petition the United States or any of its agencies for remission or mitigation of the forfeiture of the Defendants *in rem* or the Forfeited Assets. Hobby Lobby waives its rights, if any, to assert any statutory or constitutional defense in this or any other judicial or administrative proceeding related to the Defendants *in rem* or the Forfeited Assets.

    13. Hobby Lobby hereby releases, remises, and forever discharges its claims, rights, title and interest in the Defendants *in rem* and the Forfeited Assets. Hobby Lobby hereby consents to the seizure and forfeiture of the Defendants *in rem* pursuant to Title 19, United States Code, Section 1595a(c)(1)(A), and of the Forfeited Assets pursuant to and Title 19, United States Code, Section 1595a(c)(1)(A) and Title 18, United States Code, Section 981(a)(1)(C).

    14. Hobby Lobby agrees to defend, indemnify and hold harmless the United States, its agents, agencies, and employees, past and present, from any and all claims or suits brought by any persons or entities concerning, referring or related to the Defendants *in rem* or the Forfeited Assets, shall promptly provide any information requested by the

United States in defense of any such claims, and shall provide any evidence and testimony necessary to the defense of such suit.

15.     Hobby Lobby agrees to fully assist the United States in effectuating the forfeiture of the Forfeited Assets, including payment of the sum of three million dollars and zero cents ($3,000,000.00) (the "Forfeited Funds"), by, among other things, executing any documents necessary to effectuate the transfer of title to the Forfeited Assets to the United States.

16.     Hobby Lobby shall pay the full amount of the Forfeited Funds by certified or official bank check, payable to the "United States Customs and Border Protection" and cause said check to be delivered to Assistant United States Attorney Karin Orenstein, United States Attorney's office, Eastern District of New York, 271-A Cadman Plaza East, 7th Floor, Brooklyn, New York 11201, by hand, express mail, or overnight delivery, within five (5) business days of the execution of this Stipulation.  Hobby Lobby agrees that the forfeiture of the Defendants *in rem* and Forfeited Assets does not constitute a fine, penalty or payment of any taxes that may be due and owing.

17.     With respect to the Forfeited Assets, Hobby Lobby waives the filing of a civil forfeiture complaint in accordance with the procedures set forth in 18 U.S.C. § 983, any notice requirements arising pursuant to Rule G or otherwise, and any defenses to judicial or administrative forfeiture of the Forfeited Assets, including, but not limited to, venue, statute of limitations, and any defenses based upon the Double Jeopardy Clause of the Fifth Amendment or the Excessive Fines Clause of the Eighth Amendment.

18.     Hobby Lobby acknowledges that the Office, at its sole discretion, may seek to forfeit the Forfeited Assets through commencement of an administrative or separate civil forfeiture proceeding.  Hobby Lobby consents to the entry of an administrative declaration of forfeiture as to the Forfeited Assets, and waives the requirements of Title 18, United States Code, Section 983, regarding notice of seizure in non-judicial forfeiture matters.

19.     Hobby Lobby agrees not to file or interpose any claim or to assist others to file or interpose any claim to the Defendants *in rem* or the Forfeited Assets in any judicial or administrative proceeding related to the Defendants *in rem* or the Forfeited Assets.

20.     Hobby Lobby agrees to release, remise and forever discharge the United States of America, and its agencies, agents, officers, and employees, past and present, from all claims or causes of action which the Hobby Lobby and its agents, assigns, representatives, and successors ever had, now have, or hereafter may have against the United States and/or its agencies, agents, officers, and employees, past and present, for or on account of the commencement of this action, the seizure and restraint of the Defendants *in rem*, the settlement of this action, and/or the forfeiture of the Defendants *in rem* or Forfeited Assets.

21.     Hobby Lobby waives its right, if any, to use the instant action or its settlement as a basis for any common-law, statutory, or constitutional defense in any other civil, criminal, or administrative action unrelated to the Defendants *in rem* and the property for which the Forfeited Assets substitute in which the United States, and/or any of its component agencies, is a party, including, without limitation, venue, defenses based upon the

Double Jeopardy Clause of the Fifth Amendment and the Excessive Fines Clause of the

Eighth Amendment to the United States Constitution.

22.     The United States will publish notice of the seizure of the Defendants

*in rem* and the Forfeited Assets and of its intent to forfeit the Defendants *in rem* and

Forfeited Assets on the government's official website, www.forfeiture.gov, consistent with

the custom and practice in this judicial district.

23.     Upon completion of publication and provided that no third-party claims

are filed with respect to the Defendants *in rem* and Forfeited Assets, the United States shall

seek a decree of forfeiture forfeiting the Defendants *in rem* and Forfeited Assets to the

United States.

24.     Upon the issuance of a decree of forfeiture forfeiting the Defendants *in*

*rem* and the Forfeited Assets, the Department of Justice, United States Department of

Homeland Security, and their duly authorized agents and/or contractors shall be authorized to

dispose of the Defendants *in rem* and Forfeited Assets in accordance with all laws and

regulations.

25.     With respect to any and all "Artifacts" that are part of the purchase

"Order" (as such terms are defined in paragraph 8 of the attached Statement of Facts) and

which are not included in the Defendants *in rem*, Hobby Lobby agrees not to file a claim of

right, title or interest to such Artifacts, consents to their forfeiture in any judicial or

administrative forfeiture proceeding, and agrees not to petition the United States or any of its

agencies for remission or mitigation of the forfeiture. Hobby Lobby agrees that in the event

that any such Artifacts come into its physical custody or control, whether inside or outside of

the United States, Hobby Lobby will immediately notify the Office and arrange for such Artifacts to be delivered to a place to be designated by the Office at Hobby Lobby's sole expense, using a packing and shipping method mutually agreed upon by the Parties. Hobby Lobby agrees that if it receives notice from a party who claims to be in possession or aware of the location of any Artifacts that are part of the Order but have not been forfeited pursuant to this Stipulation, Hobby Lobby will immediately notify the Office and provide any and all new information and documentation it received regarding the status and location of such Artifacts.

26. Peter Dobelbower, Hobby Lobby's General Counsel and the undersigned outside counsel for Hobby Lobby represent that they are authorized to enter into this Settlement Agreement and to execute this and all other documents necessary to effectuate the settlement of this action on behalf of Hobby Lobby.

## COMPLIANCE MEASURES

27. Hobby Lobby represents that it has adopted internal policies and procedures for the importation and purchase of Cultural Property[1] ("Antiquities Policy"), a copy of which has been provided to the United States. Hobby Lobby (including for purposes of this paragraph the principal shareholders and the Affiliated Entities), shall not sell, gift, assign or otherwise transfer Cultural Property to another individual or institution unless such

---

[1] "Cultural Property" in this Stipulation shall mean Antiquities and Cultural Objects. "Antiquities" are defined as objects of cultural significance created in antiquity and discovered on or below the ground or under water as a result of scientific or clandestine excavation, exploration or digging activities or inadvertently as a result of other activities. Examples include, without limitation, cuneiform tablets, clay bullae and cylinder seals. "Cultural Objects" are defined as cultural materials, other than Antiquities, that are at least 200 years old. Examples include, without limitation, manuscripts and Torah scrolls.

transfer is done in compliance with either: (a) the Association of Art Museum Directors Guidelines on the Acquisition of Archaeological Material and Ancient Art (2013), or (b) the Association of Art Museum Directors Protocols for Safe Havens for Works of Cultural Significance from Countries in Crisis. "Affiliate" means any entity controlling, controlled by or under common control with Hobby Lobby. "Entity" means any corporation, partnership, limited liability company, trust, or other entity.

28.     Hobby Lobby personnel identified in the Antiquities Policy as being responsible for purchasing, importing, or receiving Cultural Property on behalf of the Company, or supervising or approving any such purchase, importation, or receipt of Cultural Property ("Responsible Personnel"), shall be trained no less frequently than annually in the basics of customs requirements, provenance requirements, and due diligence in the purchase and importation of Cultural Property ("Training"). Training shall cover Customs laws and regulations relating to importation in general and with respect to Cultural Property specifically, as well as the criminal, civil, and administrative penalties and other consequences associated with improper importation of Cultural Property. The first Training must be completed within six months of this Stipulation, with a second training to be completed before the close of the Term of this Stipulation.

29.     Hobby Lobby agrees to engage qualified customs counsel ("Customs Counsel") to (i) provide or supervise the Training; (ii) advise Hobby Lobby with respect to any modifications to the Antiquities Policy; (ii) advise Hobby Lobby with respect to all proposed and completed acquisitions and importations of Cultural Property, including without limitation (a) overseeing importation and provenance due diligence, and

(b) preparation and negotiation of appropriate purchase documentation; and (iii) generating the Reports required by paragraphs 31 through 33, below.

30.     Hobby Lobby agrees to engage a qualified customs broker to provide customs brokerage services for all importations of Cultural Property.

## REPORTING REQUIREMENT

31.     Hobby Lobby shall advise Customs Counsel to deliver to the Office quarterly reports within thirty (30) days after the last day of each calendar quarter ending during the Term (as defined below) (the "Reporting Deadline"), commencing with the first calendar quarter ending after execution of this Stipulation (the "Quarterly Reports"); provided, that not less than five Business Days prior to the Reporting Deadline for any Quarterly Report, Hobby Lobby may deliver a written request for an extension of time to deliver such Quarterly Reports ("Request for Extension"). Within ten (10) Business Days after Hobby Lobby delivers a Request for Extension, the Office shall notify Hobby Lobby in writing ("Reply to Request for Extension") whether it consents to or rejects such Request for Extension; provided that the Office shall not unreasonably deny or condition its consent to any timely Request for Extension. If the Office consents to a Request for Extension, the Reply to the Request for Extension shall set forth the new, extended Reporting Deadline (also the "Reporting Deadline"). "Business Day" shall mean any day on which banks and government offices are generally open for business in New York, New York.

32.     The Quarterly Reports shall include a spreadsheet containing information concerning all Cultural Property acquired and/or imported by the Company during such quarter, including the following: description; country of origin; HTSUS Code;

entered value; invoice price; vendor; shipper; entry type (e.g., formal, informal); entry

number; mode of transportation (*e.g.*, mail, air cargo, sea cargo, hand-carry, etc.); and, name

of the customs broker making the Customs entry.  In addition, the Quarterly Reports shall

note any changes in Hobby Lobby's Antiquities Policy and the dates and subjects of any

Training that took place since the submission of the previous Quarterly Report.

      33.    During the Term (as defined below), Hobby Lobby shall notify the

Office promptly after the date Hobby Lobby definitively determines, based on the relevant

information then actually known to Hobby Lobby (the "Determination Date"), that during

the period commencing 180 days before the first day of the Term and ending on last day of

the Term, (a) Hobby Lobby has failed to comply in any material respect with the customs

laws or regulations governing Hobby Lobby's importation of any Cultural Property, or

(b) any third party has provided Hobby Lobby with any materially false information

concerning the provenance or ownership history of any Cultural Property imported by Hobby

Lobby (each such notice being a "Paragraph 33 Notice").

## TERM

      34.    Hobby Lobby shall implement and comply with the provisions in

paragraphs 27 through 33 beginning on the date on which the Complaint is filed and ending

eighteen (18) months thereafter (the "Term").

## BREACH OF THIS STIPULATION

      35.    Hobby Lobby acknowledges that as of the date of this Stipulation the

monetary damages arising out of Hobby Lobby's breach of its obligations under this

Stipulation cannot be estimated or quantified with any accuracy.  Consequently, Hobby

Lobby and the Office agree that Hobby Lobby's failure to comply with its obligations under certain provisions of this Stipulation may lead to the imposition of the following monetary penalties (hereafter "Stipulated Penalties"), in accordance with the following provisions:

A.     A Stipulated Penalty of $2,000 per day for each day Hobby Lobby (1) fails to implement and maintain compliance measures as set forth in paragraphs 27 through 33 above; (2) fails to cause the delivery of any Quarterly Report by the Reporting Deadline applicable thereto; or (3) fails to timely deliver any Paragraph 33 Notice. With regard to the Training, the Stipulated Penalty will begin to accrue one year after the date of the previous Training and continue until the Training has taken place. With regard to any Quarterly Report, the Stipulated Penalty will begin to accrue on the first day after the Reporting Deadline applicable thereto, subject to the opportunity to cure set forth below; provided, that if the Office rejects a Request for Extension of the applicable Reporting Deadline, Stipulated Penalties shall not begin to accrue until three Business Days after the delivery date of the Office's Reply to the applicable Request for Extension. With respect to any Paragraph 33 Notice, the Stipulated Penalty will begin to accrue two weeks after the applicable Determination Date.

B.     Upon the Office's reasonable determination that Hobby Lobby has failed to comply with any of the obligations described herein, the Office shall notify Hobby Lobby in writing of Hobby Lobby's failure to comply and the Office's exercise of its contractual right to demand payment of the Stipulated Penalties (the Notice of Breach"). The Notice of Breach shall set forth: (1) the provision(s) breached (the "Specified Breach"); (2) the date the Specified Breach became actionable pursuant to this Stipulation (the "Breach

Date"); (3) a description of the Specified Breach sufficient to permit Hobby Lobby to cure

(as described below); and (4) the amount of Stipulated Penalties claimed by the Office as of

the date of the Notice of Breach.  During the period commencing on the date of delivery of

the Notice of Breach and ending fourteen (14) days thereafter (as such period may be

extended in writing by the Office, the "Cure Period"), Hobby Lobby shall use commercially

reasonable efforts to cure the Specified Breach to the Office's reasonable satisfaction

("Cure").  Within two (2) Business Days after the last day of the Cure Period, the Office

shall notify Hobby Lobby in writing whether or not Hobby Lobby has Cured the Specified

Breach, and if applicable, specifying in reasonable detail why Hobby Lobby has failed to

effect a Cure.  If Hobby Lobby Cures the Specified Breach within the Cure Period, no

Stipulated Penalties shall be due with respect thereto.  If Hobby Lobby fails to Cure the

Specified Breach during the Cure Period, Stipulated Penalties calculated from the Breach

Date to the date of payment shall be payable to the United States Treasury within three (3)

Business Days of the end of the Cure Period.  Stipulated Penalties shall continue to accrue

and become due and payable by electronic fund transfer every two weeks until the Specified

Breach is Cured.  Such Stipulated Penalties shall be paid by certified or official bank check,

payable to the "United States Department of Justice" and Hobby Lobby shall cause said

check to be delivered to Assistant United States Attorney Karin Orenstein, United States

Attorney's office, Eastern District of New York, 271-A Cadman Plaza East, 7th Floor,

Brooklyn, New York 11201, by hand, express mail, or overnight delivery.  Upon receipt, the

Stipulated Penalties shall be deposited into the U.S. Treasury pursuant to the Miscellaneous

Receipts Act, Title 31, United States Code, Section 3302, which authorizes deposits of public

money into the U.S. Treasury. Hobby Lobby agrees that the United States District Court for the Eastern District of New York shall have jurisdiction over any action to collect any unpaid Stipulated Penalties or any action arising out of the Office's determination that Hobby Lobby has failed to Cure any Specified Breach.

## SALE, MERGER, OR OTHER CHANGE IN CORPORATE FORM

36.   Except as may otherwise be agreed by the parties in connection with a particular transaction, Hobby Lobby agrees that in the event that a Change of Control occurs during the Term, the definitive transaction documents shall provide that the purchaser, transferee, surviving entity, or successor in interest to Hobby Lobby shall be bound by this Stipulation and Hobby Lobby shall be released therefrom. "Change of Control" shall mean any transaction (whether by sale or transfer of assets or equity, merger, consolidation, reorganization, or other business combination) that results in the transfer of ownership or voting control (by ownership of a majority of the voting power, agreement or otherwise), directly or indirectly, of all or any substantial portion of the business, operations and/or assets of the Company related to the importation of Cultural Property as they exist as of the date of this Stipulation to any one or more natural person(s) or entity(ies) that is not then an Affiliate of Hobby Lobby. The Company shall notify the Office upon the completion of any such Change in Control, in order to give the Office an opportunity to determine if such Change in Control would impact the terms or obligations of the Stipulation. Hobby Lobby shall indemnify any such successor in interest for any breaches of this Stipulation.

## OTHER PROVISIONS

37.     This Stipulation shall be effective on the date that it is signed by all of the Parties.

38.     The Company agrees to perform the further acts required by this Stipulation, to execute and deliver any and all further documents that may be reasonably necessary or desirable to effectuate the purposes of this Stipulation, to refrain or forbear from any act that would be inconsistent with the Stipulation, and to otherwise cooperate with the United States in executing its obligations under this Stipulation.

39.     The Company acknowledges that it is, and has been, represented by competent counsel in connection with the negotiation, preparation, and execution of this Stipulation and the legal effects thereof have been duly explained, and that it is entering into this Stipulation freely and voluntarily, without coercion, duress or undue influence.

40.     The Parties agree that each Party shall bear its own costs and attorney's fees associated with the importation, seizure, restraint, and forfeiture of the Defendants *in rem* and the Forfeited Assets, and Hobby Lobby further agrees to waive any and all rights it may have to recover costs, attorney's fees and/or interest under the Equal Access to Justice Act, the Civil Asset Forfeiture Reform Act, or any other legal, statutory or equitable bases.

41.     This Stipulation, and any other dispute arising thereof, shall be governed by the laws of the United States. The Parties agree that the exclusive jurisdiction and venue for any dispute arising between and among the Parties under this Stipulation shall be the United States District Court for the Eastern District of New York. This Court shall retain jurisdiction to enforce this Stipulation.

42.    In the event that any disputes arise about the interpretation of or compliance with the terms of this Stipulation, the Parties will endeavor in good faith to resolve any such disputes between themselves before seeking intervention from the Court. However, in the event of either a failure by one of the Parties to this Stipulation to comply with its terms or an act by one of the Parties in violation of any provision hereof, either Party may move this Court to impose any remedy authorized by law or equity.

43.    This Agreement is binding on Hobby Lobby and the Office and specifically does not bind any other federal, state, or local law enforcement or regulatory agency, except that the United States agrees that its agencies, agents, officers, and employees will not seek from Hobby Lobby any further fines, penalties or forfeitures in connection with any past violations of Title 18, United States Code, Sections 541, 542, 545, 2314 and/or 2315 or other Customs laws or regulations involving the Defendants *in rem* or any reimbursement, charges or fees associated with the importation, seizure, restraint, and/or forfeiture of the Defendants *in rem* and the Forfeited Assets, including, but not limited to, warehouse storage charges. The Parties agree that the statute of limitation period which was tolled by the tolling agreements executed between the Office and Hobby Lobby to date will be deemed to be expire after issuance of a warrant for arrest of articles *in rem* as to the Defendants *in rem*.

44.    Hobby Lobby and the Office agree that, upon the filing of the Complaint, this Stipulation (including its attachments) shall be publicly filed in the United States District Court for the Eastern District of New York.

45.    This Stipulation, including its attachments, sets forth all the terms of the agreement between Hobby Lobby and the Office. No amendments, modifications or

additions to this Stipulation shall be valid unless they are in writing and signed by the Office,

the attorneys for the Hobby Lobby, and a duly authorized representative of Hobby Lobby.

Where the modification constitutes a material change to any term of this Stipulation, it shall

be effective only upon approval by the Court.  No breach of this Stipulation shall be

construed as an implied amendment or agreement to amend or modify any of its provisions.

      46.    All notices, consents, and other notifications or communications

required or permitted under this Stipulation shall be in writing and shall be deemed given or

delivered (a) when delivered personally, or (b) when delivered by email transmission, subject

to electronic confirmation of delivery by the sender's email service, provided that a hard

copy of the emailed notice, consent, or other notification is delivered by FedEx, prepaid, and

shall be addressed as follows:

      If to Hobby Lobby, to:

      Hobby Lobby Stores Inc.
      7707 S.W. 44th Street
      Oklahoma City, Oklahoma 73179
      Attention:  John Graham, Assistant General Counsel
      email: john.graham@hobbylobby.com

      in all cases with a copy to:

      Kramer Levin Naftalis & Frankel LLP
      1177 Avenue of the Americas
      New York, New York 10036
      Attn: Barry H. Berke, Esq.
      email: bberke@kramerlevin.com

      in all cases with a copy to:

      Pearlstein McCullough & Lederman LLP
      1180 Avenue of the Americas, 8th Floor
      New York, New York 10036

Attn: Michael McCullough, Esq.
email: mmccullough@pmcounsel.com

If to the United States, to:

United States Attorney
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201
Attn: Karin Orenstein, Assistant U.S. Attorney
Email: karin.orenstein@usdoj.gov
and
Attn: Ameet B. Kabrawala, Assistant U.S. Attorney
Email:ameet.kabrawala@usdoj.gov

or to such other address as such Party may indicate by a written notice delivered to the other

Party.

47.     It is contemplated that this Stipulation may be executed in one or more

counterparts, each of which shall be deemed an original, but all of which together will

constitute one and the same instrument.  Signature pages may be faxed or scanned and such

signatures shall be deemed as valid originals.

Dated: Brooklyn, New York        BRIDGET M. ROHDE
*June 29*, 2017       Acting United States Attorney
                              Eastern District of New York

By: _____
        Karin Orenstein
        Ameet B. Kabrawala
        Assistant United States Attorneys
        (718) 254-7000

Dated: New York, New York      Kramer Levin Naftalis & Frankel LLP
*June 29*, 2017       *Attorneys for Hobby Lobby*
                              1177 Avenue of the Americas
                              New York, New York 10036

By: _____
        Barry H. Berke, Esq.
        (212) 715-7560

Dated: New York, New York      Pearlstein, McCullough & Lederman, LLP
_____, 2017      *Attorneys for Hobby Lobby*
                              1180 Avenue of the Americas, 8th Floor
                              New York, New York 10036

By: _____
        Michael McCullough, Esq.
        (646) 762-7264

constitute one and the same instrument.  Signature pages may be faxed or scanned and such

signatures shall be deemed as valid originals.


Dated:  Brooklyn, New York                          BRIDGET M. ROHDE
               _____, 2017          Acting United States Attorney
                                                     Eastern District of New York


                                        By:  _____
                                             Karin Orenstein
                                             Ameet B. Kabrawala
                                             Assistant United States Attorneys
                                             (718) 254-7000


Dated:  New York, New York                          Kramer Levin Naftalis & Frankel LLP
               _____, 2017          *Attorneys for Hobby Lobby*
                                                     1177 Avenue of the Americas
                                                     New York, New York 10036


                                        By:  _____
                                             Barry H. Berke, Esq.
                                             (212) 715-7560


Dated:  New York, New York                          Pearlstein, McCullough & Lederman, LLP
        June 29          , 2017                      *Attorneys for Hobby Lobby*
                                                     1180 Avenue of the Americas, 8th Floor
                                                     New York, New York 10036


                                        By:  *Michael McCullough*
                                             Michael McCullough, Esq.
                                             (646) 762-7264

AGREED AND CONSENTED TO BY:

On Behalf of Hobby Lobby Stores, Inc.

    On the ____ day of _____ in the year 2017, _____ on behalf of Hobby Lobby Stores, Inc., known to me, the undersigned, or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to above, personally appeared before me and acknowledged to me and executed the foregoing document.

NOTARY PUBLIC

> **TONYA L. LAWSON**
> **Notary Public**
> **State of Oklahoma**
> **Commission # 02013568   Expires 09/02/18**

SO ORDERED:

_____
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF NEW YORK

_____, 2017
Date

Attachments:

Attachment A:    Certification by General Counsel of Hobby Lobby Stores, Inc.
Attachment B:    Statement of Facts

HOBBY LOBBY STORES, INC.

Certificate of General Counsel

I, Peter Dobelbower, General Counsel of Hobby Lobby Inc., an Oklahoma corporation (the "*Company*"), hereby certify that the resolutions attached to this Certificate as Exhibit A have been approved and adopted by the Board of Directors of the Company and remain in full force and effect and unamended as of the date hereof.

HOBBY LOBBY INC.

By: _____

Peter Dobelbower, General Counsel

Date: June 28, 2017

**February 28, 2017**

### MINUTES OF ANNUAL MEETING OF BOARD OF DIRECTORS
### HOBBY LOBBY STORES, INC.,
### an Oklahoma corporation

The annual meeting of the Board of Directors of Hobby Lobby Stores, Inc., was held at 7707 SW 44th Street, Oklahoma City, Oklahoma 73179, on February 28, 2017, at 9:30 a.m., pursuant to the foregoing Waiver of Notice of Regular Meeting of Board of Directors signed by all of the Directors.

The following Directors were present in person:



Mart D. Green

Stan Lett

Mart D. Green was chosen temporary Chairman and he requested that Stan Lett act as Secretary of the meeting.

No objection being made, a reading of the minutes of the last meeting of the Board of Directors was dispensed with and, on motion duly made, seconded, and carried, the minutes were unanimously approved without reading.



Peter M. Dobelbower, Vice President - Legal, Chief Legal Officer, and Assistant Secretary

Hobby Lobby Stores, Inc.
February 28, 2017
Minutes of Annual Meeting of Board of Directors
Page 2



The Chairman thereupon took the chair as such officer, and the temporary Secretary continued to act as Secretary by virtue of his election to that office.

The Chairman announced that the next order of business was conveying executory authority upon all Officers of the Corporation pursuant to the Bylaws. After discussion and upon motion duly made, it was declared:

WHEREAS, pursuant to Article IX of the SIXTH AMENDED AND RESTATED BYLAWS of HOBBY LOBBY STORES, INC., the Board of Directors may authorize any officer or officers of the Corporation, to enter into any contract or to execute and deliver any instrument in the name of and behalf of the Corporation, except certificates representing shares

Hobby Lobby Stores, Inc.
February 28, 2017
Minutes of Annual Meeting of Board of Directors
Page 3

of stock of the Corporation, and such authority may be general or confined to specific instances;

**AND WHEREAS**, the Corporation desires that all Officers of the Corporation shall have signing authority to bind the Corporation;

**BE IT RESOLVED**, that all Officers of the Corporation shall have the full power and authority to act on behalf of the Corporation and bind the Corporation to any and all documents, agreements and contracts (collectively, "Contracts") executed on behalf the Corporation, and that such Contracts are hereby ratified, approved and confirmed by the Corporation.



Hobby Lobby Stores, Inc.
February 28, 2017
Minutes of Annual Meeting of Board of Directors
Page 4



The Chairman then reviewed the actions of the Officers of the Corporation taken since their election at the last regular directors' meeting on February 23, 2016, and, after discussion and upon motion duly made, seconded, and unanimously carried, it was

RESOLVED: That the actions of the Officers of this Corporation taken and had since their election on February 23, 2016, be and the same are hereby in all respects approved, ratified and confirmed.

There being no further business to come before the meeting, the same was adjourned upon motion duly made and seconded.

Stan Lett, Secretary

APPROVED:

Mart D. Green, Chairman

## STATEMENT OF FACTS

The following Statement of Facts is incorporated by reference as part of the Settlement Agreement (the "Agreement") between the United States Attorney's Office for the Eastern District of New York (the "Office") and Hobby Lobby Stores, Inc. ("Hobby Lobby" or the "Company"). Hobby Lobby admits, accepts and acknowledges that it is responsible for the acts of its officers, directors, employees and agents, as set forth below. The parties stipulate that the following facts are true and correct. Certain of the facts herein are based on information obtained from third parties by the United States through its investigation and were described to Hobby Lobby. Hobby Lobby consents to entry of a final judgment and forfeiture in the form attached hereto.

### Background Concerning Hobby Lobby and Related Entities

1.      Hobby Lobby is a privately-held Oklahoma corporation headquartered in Oklahoma City, Oklahoma. In or about 2010 through 2011, Hobby Lobby's affiliates included Mardel, Inc. ("Mardel") and Crafts Etc!, LTD. ("Crafts, Etc!"), both of which maintained their principal corporate offices adjacent to Hobby Lobby's headquarters in Oklahoma City, Oklahoma.

### Hobby Lobby's Acquisition of Cultural Property

2.      In or about 2009, Hobby Lobby began to assemble a collection of historically important manuscripts, antiquities and other cultural materials (the "Collection"). Hobby Lobby's president (the "President") approved purchases for the Collection and was advised by a former consultant (the "Consultant") retained by Hobby Lobby.[1]

---

[1]      The identities of the President and the Consultant are known to the Office and the

3.      On or about July 15, 2010, Hobby Lobby's President and the Consultant inspected a group of cultural objects being offered for sale in the United Arab Emirates ("UAE") (the "July 2010 Inspection"), including cuneiform tablets.   Cuneiform is an ancient system of writing on clay tablets that was used in ancient Mesopotamia.

4.      Several antiquities dealers from Israel, including "Israeli Dealer #1" and "Israeli Dealer #2," as well an antiquities dealer from the UAE (the "UAE Dealer" and together with Israeli Dealer #1 and #2, the "Dealers") attended the July 2010 Inspection.[2] During the July 2010 Inspection, the Dealers spread the objects on the floor, arranged them in layers on a coffee table, and packed them in cardboard boxes, in many instances with little or no protective material between them.   Following the inspection, the Dealers proposed a sale of a larger group of cultural objects that included approximately 5,548 individual pieces of cuneiform tablets, clay bullae, and cylinder seals (each an "Artifact" and together the "Artifacts").

5.      On or about August 23, 2010, the Consultant reported to the President and the President's executive assistant (the "Executive Assistant") that he had met with Israeli Dealers #1 and #2 in Israel, and they told him that the Artifacts inspected in the UAE belonged to the family collection of another dealer ("Israeli Dealer #3").   Israeli Dealer #3 was not present for the July 2010 Inspection in the UAE.

---

Company.

[2]      The identities of Israeli Dealer #1, Israel Dealer #2, and the UAE Dealer are known to the Office and the Company.

6.      On or about August 30, 2010, Israeli Dealer #1 sent Hobby Lobby a provenance statement from Israeli Dealer #3 for 5,513 of the 5,548 Artifacts (35 clay envelope seals were not included)(the "5,513 Artifacts").   The provenance statement indicated that the 5,513 Artifacts were "legally acquired in the late 1960s by [Israeli Dealer #3's] father, from local markets[.]"   The provenance statement further indicated that the collection had been moved to the United States for storage in the 1970s, named the person storing the artifacts (the "Alleged Custodian"), and listed the Alleged Custodian's address in Mississippi and telephone numbers.   At no time did Hobby Lobby or any of its agents contact the Alleged Custodian to confirm the Alleged Custodian's involvement with the 5,513 Artifacts.   In fact, the Alleged Custodian first met Israeli Dealer #3 during a 2007 trip to Israel and did not store any material for Israeli Dealer #3.

7.      In or about and between August 2010 and October 2010, Hobby Lobby retained an expert in cultural property law (the "Expert") to address legal issues relevant to the acquisition of cultural property, actions to take in carrying out due diligence and provenance research, and the particular legal issues pertaining to cultural property.[3]   The Expert provided advice on these issues during a meeting at Hobby Lobby's headquarters in August 2010 and in a memorandum provided to Hobby Lobby in October 2010.   Among other things, the Expert informed Hobby Lobby that the acquisition of cultural property from Iraq, including cuneiform tablets and cylinder seals, carries a risk that such objects may have been looted from archaeological sites in Iraq.   The Expert also advised Hobby Lobby to review its collection of antiquities for any objects of Iraqi origin and to verify that their

---

[3]      The identity of the Expert is known to the Office and the Company.

3

country of origin was properly declared at the time of importation into the United States. The Expert further advised Hobby Lobby that an improper declaration of country of origin of cultural property could lead to seizure and forfeiture of such cultural property by the United States Customs and Border Protection ("CBP").

8.     On or about December 8, 2010, Israeli Dealer #2 and Hobby Lobby, through its President, signed a purchase agreement for the sale of the Artifacts to Hobby Lobby for $1,600,000.00 United States Dollars (the "Order").   According to the invoice attached to the purchase agreement for the Order (the "Invoice"), the seller was Israeli Dealer #3, and individual prices for the Artifacts on the Invoice ranged from $280.40 to $1,000.00 per item.   No Hobby Lobby representatives or agents had ever met or communicated with Israeli Dealer #3 prior to December 8, 2010.   The invoice falsely stated that the Artifacts in the Invoice were "originally from Israel."

9.     On or about December 8, 2010, Hobby Lobby authorized payment of $1,600,000.00 for the Order to be wired to seven personal bank accounts associated with five different individuals.   The payees included the Dealers and two other individuals, but did not include Israeli Dealer #3, who was represented in the Invoice to be the seller of the Artifacts.

10.     On or about December 10, 2010, Israeli Dealer #1 asked Hobby Lobby to revise the purchase agreement to replace Israeli Dealer #2 with Israeli Dealer #3 as the seller of the Artifacts, explaining that the Artifacts were from the family collection of Israeli Dealer #3.

11.     On or about December 15, 2010, the President and Israeli Dealer #3 executed a revised purchase agreement for the Order.

12.     In 2010 and 2011, Hobby Lobby had an International Department that was tasked with facilitating the importation and customs clearance of merchandise purchased by the Company.   The International Department routinely worked with a particular customs broker (the "Customs Broker") to import merchandise purchased by Hobby Lobby from foreign vendors.[4]

13.     Commencing on or about November 9, 2010, a Hobby Lobby employee tasked with receiving and cataloguing artifacts purchased for the Collection (the "Curator") began working with Hobby Lobby's International Department and the Executive Assistant to coordinate the importation of the Artifacts.[5]   The International Department advised the Curator and Executive Assistant that the Artifacts should be imported using the Customs Broker.   After the Customs Broker reported that the Artifacts could be detained by CBP, the Curator and Executive Assistant agreed on their own to bypass the International Department and Customs Broker and have the vendor handle the shipping arrangements for the Order.

## Importation of the Artifacts

14.     On or about November 23, 2010, prior to the execution of the purchase agreement for the Order, the UAE Dealer shipped the first package of Artifacts under the agreement to Hobby Lobby by international post.   The shipping label on the exterior of the package was misleading because it described the contents as "ceramic tiles."   The shipment contained either 13 or 23 pieces of the Artifacts.   No formal entry was made for this

---

[4]     The identity of the Customs Broker is known to the Office and the Company.

[5]     The identity of the Curator is known to the Office and the Company.

shipment, even though a formal entry was required because the value of the contents of the package exceeded $2,000.   The package was received by Hobby Lobby.

15.   On December 19, 2010, the UAE Dealer shipped three more packages by international post, each containing between 13 and 18 pieces of the Artifacts.   The shipping labels falsely described the packages' contents as "Tiles (Sample)."   The shipping labels did not list a country of origin or value for the contents.   Each shipment was addressed to the President and/or the Executive Assistant.   The remaining address information on the shipments, however, alternated between three different business entities: Hobby Lobby, Mardel, and Crafts Etc!.   The President had authorized the use of these three addresses at the request of the UAE Dealer.   No formal entries were made for these shipments.   All three packages, which had a value that exceeded $2,000, were received by Hobby Lobby.

16.   On December 20, 2010, the UAE Dealer shipped three more packages by international post to the President or Executive Assistant using the addresses for Hobby Lobby, Mardel, and Crafts Etc!.   Each of these packages contained between 12 and 18 pieces of the Artifacts.   The shipping labels again falsely described the packages' contents as "Tiles (Sample)."   The shipping labels did not list a country of origin or value for the contents.   No formal entry was made for this shipment, even though a formal entry was required because the value of the contents of the package exceeded $2,000.   The package was received by Hobby Lobby.

17.   The foregoing shipments on November 23, December 19, and December 20, 2010 were sent by international post and processed at the international mail

facility at John F. Kennedy International Airport in Queens, New York, within the Eastern District of New York.

### Seizure of Artifacts by CBP

18.     On or about December 22, 2010, the UAE Dealer advised the Executive Assistant that the international post rules had changed and inquired as to whether the remaining packages could be shipped by FedEx or another private express mail carrier.

19.     On or about December 23, 2010, the Executive Assistant told the UAE Dealer that "[a]s long as you keep the value of each package under $2,000, they will not have to forward it to our broker to clear it through Customs."

20.     On or about and between December 26, 2010 and January 5, 2011, the UAE Dealer shipped approximately eight packages to Hobby Lobby via FedEx.    Each package contained between 12 and 300 pieces of the Artifacts, and the value of the contents of each package exceeded $2,000.    The UAE Dealer supplied false invoices and false shipping declarations that undervalued the pieces being shipped and stated that each package was worth between $250.00 and $300.00.

21.     The foregoing shipments between December 26, 2010 and January 5, 2011 were processed by FedEx in Memphis, Tennessee.    The first three packages were delivered to Hobby Lobby.    The next five shipments were inspected and detained by CBP in Memphis, Tennessee (the "Seized Artifacts):

        a.      First Detained Package.    On or about January 3, 2011, CBP inspected a package bearing air waybill no. 7286 2809 6729 from the UAE Dealer to "[HL's President] or [Executive Assistant]" at Mardel's address.    The shipping label falsely stated that the contents were "hand made [sic] clay tiles (sample)" manufactured in Turkey and

7

valued at $250.00.    The enclosed invoice accompanying this shipment similarly declared

falsely that the contents were 50 "hand made [sic] miniature clay tiles" valued at $5.00 each

for a total value of $250.00.    This invoice falsely indicated that the contents were sold by

the UAE Dealer to Mardel.    The package contained approximately 50 cuneiform tablets.

According to the Invoice attached to the purchase agreement for the Order, the price of each

cuneiform tablet was $280.40.    The total value of this package therefore should have been

declared as $14,020.00 and formal entry should have been made with truthful declarations as

to descriptions of the items, country of origin, the name of the seller, and the name of the

buyer.

     b.  <u>Second Detained Package</u>.    On or about January 4, 2011, CBP

inspected a package bearing air waybill no. 7286 2809 6751 from the UAE Dealer to "[HL's

President] or [Executive Assistant]" at Hobby Lobby's address.    The shipping label falsely

stated that the contents were "hand made [sic] clay tiles" manufactured in Turkey and valued

at $300.00.    The enclosed invoice accompanying this shipment similarly declared falsely

that the contents were 300.00 "hand made [sic] clay tiles (round shap[e]) (sample)" valued at

$1.00 each for a total value of $300.    The enclosed invoice falsely indicated that the

contents were sold by the UAE Dealer to Hobby Lobby.    The package contained

approximately 300 clay bullae.    According to the Invoice attached to the purchase

agreement for the Order, the value of each clay bullae was $280.40.    The total value of this

package therefore should have been declared as $84,120.00 and formal entry should have

been made with truthful declarations as to descriptions of the items, country of origin and the

name of the seller.

c.   Third Detained Package.   On or about January 4, 2011, CBP inspected a package bearing air waybill no. 7286 2809 6762 from the UAE Dealer to "[HL's President] or [Executive Assistant]" at Crafts Etc!'s address.   The shipping label falsely stated that the contents were "hand made [sic] clay tiles" manufactured in Turkey and valued at $285.00.   The enclosed invoice accompanying this shipment similarly declared falsely that the contents were 57 "hand made [sic] miniature clay tiles (sample)" valued at $5.00 each for a total value of $285.00.   The enclosed invoice falsely indicated that the contents were sold by the UAE Dealer to Crafts Etc!.   The package contained approximately 54 cuneiform tablets.   According to the Invoice attached to the purchase agreement for the Order, the value of each cuneiform tablets was $280.40.   The total value of this package therefore should have been declared as at least $15,141.60 and formal entry should have been made with truthful declarations as to descriptions of the items, country of origin, the name of the seller, and the name of the buyer.

d.   Fourth Detained Package.   On or about January 5, 2011, CBP inspected a package bearing air waybill no. 7286 2809 7173 from the UAE Dealer to "[HL's President] or [Executive Assistant]" at Mardel's address.   The shipping label falsely stated that the contents were "hand made [sic] clay tiles" manufactured in Turkey and valued at $300.00.   The enclosed invoice accompanying this shipment similarly declared falsely that the contents were 60 "hand made [sic] miniature clay tiles (sample)" valued at $5.00 each for a total value of $300.00.   The enclosed invoice falsely indicated that the contents were sold by the UAE Dealer to Mardel.   The package contained approximately 60 cuneiform tablets. According to the Invoice attached to the purchase agreement for the Order, the value of each cuneiform tablet was $280.40.   The total value of this package therefore should have been

9

declared as $16,824.00 and formal entry should have been made with truthful declarations as to descriptions of the items, country of origin, the name of the seller, and the name of the buyer.

        e.    <u>Fifth Detained Package</u>.   On or about January 5, 2011, CBP inspected a package bearing air waybill no. 7286 2809 7162 from the UAE Dealer to "[HL's President] or [Executive Assistant]" at Crafts Etc!'s address.   The shipping label falsely stated that the contents were "hand made [sic] clay tiles" manufactured in Turkey and valued at $300.00.   The enclosed invoice accompanying this shipment similarly declared falsely that the contents were 60 "hand made [sic] miniature clay tiles (sample)" valued at $5.00 each for a total value of $300.00.   The enclosed invoice falsely indicated that the contents were sold by the UAE Dealer to Crafts Etc!.   The package contained approximately 59 cuneiform tablets.   According to the Invoice attached to the purchase agreement for the Order, the value of each cuneiform tablet was $280.40.   The total value of this package therefore should have been declared as at least $16,543.60 and formal entry should have been made with truthful declarations as to descriptions of the items, country of origin, the name of the seller, and the name of the buyer.

        22.    On or about January 19, 2011, CBP seized the five detained FedEx packages, which collectively contained approximately 223 cuneiform tablets and 300 clay bullae (the "Seized Artifacts").

## Administrative Proceedings

        23.    On or about March 17, 2011, CBP sent notices of seizure for the Seized Artifacts to the President and Executive Assistant.

10

24.     On or about May 16, 2011, Hobby Lobby filed an administrative petition with CBP seeking remission of the seizures and the return of the Seized Artifacts (the "Petition").   In support of the Petition, Hobby Lobby attached the August 30, 2010 provenance statement from Israeli Dealer #3 for the 5,513 Artifacts.   Hobby Lobby also attached a May 1, 2011 provenance statement from the UAE Dealer claiming ownership of "227 clay tiles/tablets and 300 miniature ceramic tiles," which is identical to the amount and type of artifacts that comprised the Seized Artifacts and were already accounted for in Israeli Dealer #3's provenance statement.   The Petition did not explain why there were two separate provenance statements presented for the same artifacts; instead the Petition stated that Hobby Lobby "intended to purchase lots of artifacts from [Israeli Dealer #1, the UAE Dealer and Israeli Dealer #3] through one common purchase order . . . invoiced by [Israeli Dealer #3]."

25.     On or about September 7, 2011, Hobby Lobby submitted a supplemental petition to CBP (the "Supplemental Petition").   The Supplemental Petition stated that the reason that payments for the Order were made through "separate wire transfers was that various *original owners* were to be paid directly."   (Emphasis added).   This explanation was inconsistent with the fact that Israeli Dealer #3's provenance statement covered almost the entire Order and Israeli Dealer #3 was not one of the payees.   It was also inconsistent with representations made to Hobby Lobby about listing Israeli Dealer #3 in the purchase agreement because the Artifacts purportedly belonged to the family collection of Israeli Dealer #3.

### Hobby Lobby's Failure to Enforce Compliance with Federal Law

11

26.     Throughout the foregoing time period, Hobby Lobby failed to implement and enforce adequate internal controls to ensure compliance with United States laws that prohibited the entry of goods by false statements and without proper Customs declarations and the illegal importation of cultural property.   Hobby Lobby failed to implement an adequate system for verifying the provenance of cultural objects it purchased or sought to import.   Hobby Lobby permitted employees, who were not trained in federal laws and regulations concerning such matters, to circumvent Hobby Lobby's International Department and Customs Broker and import cultural property in contravention of such laws and regulations.   Hobby Lobby's foregoing compliance deficiencies and failures contributed to the importation of the Artifacts in a manner that did not comply with federal law.